# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 19, 2015 Session

## STATE OF TENNESSEE v. SHASTA JACKSON

### Appeal from the Criminal Court for Knox County
### No. 100255A     Mary B. Leibowitz, Judge

---

### No. E2014-01387-CCA-R3-CD-FILED-NOVEMER 5, 2015

---

Defendant, Shasta Jackson, appeals after being convicted by a Knox County jury of two counts of reckless endangerment, one count of second degree murder, one count of attempted second degree murder, and one count of employing a firearm during the commission of a dangerous felony. The trial court sentenced Defendant to an effective sentence of twenty-five years. In this appeal, Defendant challenges: (1) the sufficiency of the evidence; (2) the trial court's refusal to allow an expert witness testify about eyewitness identification; (3) introduction of evidence relating to Defendant's membership in the "Westside 111 Neighborhood Crips"; (4) introduction of pictures from Defendant's Facebook page; (5) the decision by the trial court to strike the testimony of a defense witness after he refused to answer a question on cross-examination; and (6) the length of her sentence. After a review of the record, we determine that Defendant is not entitled to relief. Accordingly, the judgments of the trial court are affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Bruce Poston[1] and Jamie Poston Hughes (at trial), and Gerald L. Gulley, Jr. (on appeal), Knoxville, Tennessee, for the appellant, Shasta Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta'Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] Sadly, Mr. Bruce Poston was killed in a single-car accident on October 21, 2014, after Defendant's trial and before oral argument before this Court.

# OPINION

## *Factual and Procedural Background*

On September 1, 2012, Esley Clemmons was killed by shots fired inside The Grand, a crowded Knoxville nightclub. As a result of the police investigation of the events leading up to the shooting, the Knox County Grand Jury issued a presentment charging Defendant and Princestenia Robinson[2] as follows: in Count One with the attempted first degree murder of Shondia Williams for events occurring outside The Grand; in Count Two with the attempted first degree murder of Britnie Davis; in Counts Three, Four, and Eight with employing a firearm during a dangerous felony; in Count Five with the first degree felony murder of Esley Clemmons, in Count Six with first degree felony murder of Mr. Clemmons; and in Count Seven with one count of the attempted murder of Ms. Williams, for events occurring inside The Grand.

Although categorized by the defense team as a "cat fight" and "girl drama," and categorized by the State as gang-related feuding, both sides acknowledge that the events of September 1, 2012, ended in the death of an innocent bystander. Once it became known that Defendant, Ms. Robinson, and LeeKirdrah Haynes were part of a neighborhood gang called the Westside 111 Neighborhood Crips, defense counsel filed a pretrial motion in which they sought to prohibit the State from mentioning gang affiliation or nicknames from any source, including Facebook.

At the pretrial hearing on the motion, Ms. Haynes testified that she became a friend of Defendant and Ms. Robinson when she was around seven years old. Ms. Haynes joined the Westside 111 Neighborhood Crips when she was around eighteen years old. Membership was achieved by fighting other group members. After joining the group, it was routine for members to carry guns and protect each other during fights with rivals. Ms. Haynes and Defendant even tattooed each other's nicknames, "First Lady" and "Boss Lady," respectively, on each other's left hands because they were best friends. Ms. Robinson's nickname was "Diamond Lady."

At the hearing, Defense counsel requested that the State be prohibited from referring to Defendant by her nickname "Boss Lady" because it implied that she was the leader of the group. The State argued that the nickname was relevant to show Defendant was a leader in the commission of the offense. The trial court determined that the State could refer to the women by their nicknames because the names, in and of themselves,

---

[2] At the time of Defendant's trial, Ms. Robinson was still at large. Ms. Robinson is named in the presentment as "Princestenia" but is referred to by witnesses at trial as "Pristina." In order to maintain clarity, we choose to refer to her as Ms. Robinson.

did not convey prior bad acts. The trial court, however, prohibited the State from referring to the Westside 111 Neighborhood Crips as a "gang" at that time but allowed references to the group. Additionally, the trial court determined that information from Defendant's Facebook page could be introduced to show motive and intent.

As is the case with most events involving more than one witness or participant, there are multiple versions of the events that unfolded on September 1, 2012. We will describe the facts placed before the jury by dividing the factual background section into State's proof and Defendant's proof.

*State's Proof*

Ms. Haynes was the primary witness for the State. As she explained in the pretrial hearing, she informed the jury that the three women—Ms. Robinson, Defendant, and herself—met when they were young girls living in the same neighborhood. They joined the Westside 111 Neighborhood Crips around the age of eighteen but also considered themselves friends outside of that organization. Ms. Haynes had the nickname of "First Lady," Defendant went by the nickname "Boss Lady," and Ms. Robinson had the nickname of "Diamond Lady." Ms. Haynes had Defendant's nickname tattooed on her left hand and vice versa.

Both Defendant and Ms. Robinson were owners of .380 semi-automatic handguns. They both routinely carried the handguns and shared bullets.

Around 3:00 a.m. on the day of the incident, the Defendant, Ms. Robinson and Ms. Haynes were riding around Knoxville in Defendant's late 80's model Chevrolet. They drove by The Grand, a nightclub. The women were dressed for the club. Defendant was wearing a "skimpy" outfit that consisted of tightly fitting short shorts and a top that resembled a brassiere.

Shondia Williams, Britnie Davis, and others were outside the club talking. Ms. Davis claimed that as Defendant's car drove by someone from the car called her a "bitch."[3] In retaliation for the name calling, Ms. Davis went up to the stopped car and spat on the window. Defendant drove the car away. Ms. Davis bragged to her cousin, Ms. Williams, about spitting on the car. Ms. Haynes, on the other hand, testified that it was Ms. Williams who spat on the car.

---

[3] It appears that there was already bad blood between Ms. Williams, Ms. Davis, and the members of the Westside 111 Neighborhood Crips stemming from a large fight in January of 2012. Ms. Davis was involved in another unrelated fight in May of 2012. A video of this fight was uploaded to her Facebook page. Defendant, Ms. Robinson, and Ms. Haynes wrote negative comments on Ms. Davis's Facebook page, essentially starting an online argument.

Shortly thereafter, Defendant's car drove by The Grand for a second time. According to Ms. Davis, as the car passed this time, Ms. Robinson held a gun out of the window. Neither Ms. Davis nor Ms. Williams considered this to be a threatening gesture so they did not call the police. Ms. Davis walked to her car that was parked nearby and sat on the hood. Soon thereafter she decided that she would fight Defendant and the others so she walked back toward The Grand.

At that point, Ms. Davis saw Defendant, Ms. Robinson, and Ms. Haynes had returned, wearing their "Jordans."[4] They walked toward Ms. Williams. Defendant had a gun in her hand. She was holding the gun down by her leg. Ms. Haynes asked who spit on the car. Defendant repeated the question. Ms. Robinson pointed a gun at Ms. Davis. Ms. Davis testified Defendant turned and also pointed a gun at her, explaining that "shots just started firin' and I start[ed] runnin'." Ms. Davis claimed that Defendant "never pointed her gun at [Ms. Williams]" and only pointed the gun at her. Ms. Davis did not actually see Defendant pull the trigger of the gun. Ms. Haynes testified that Defendant discharged all the bullets from the gun by shooting them at the ground. Ms. Robinson did not shoot her gun at that time because the gun jammed. Ms. Davis ran into the woods at the back of The Grand and did not return to the club.

After this exchange, Ms. Haynes, Defendant, and Ms. Robinson again left the area outside The Grand, driving to an apartment complex where they met Aubrey Neal and Daniel Hardin. Mr. Hardin was also a member of the Westside 111 Neighborhood Crips. The group decided to go back to the club. Ms. Haynes testified that Defendant did not bring her gun because she was out of bullets. She left her gun in her car at the apartment complex under the seat. They drove back to The Grand in Mr. Neal's car.

When the women arrived back at the club, Ms. Williams was inside talking to Esley Clemmons and his girlfriend, Ladreama Johnson. The club was full of people. Ms. Haynes entered the club in front of Defendant and Ms. Robinson.

Ms. Williams claimed that Defendant and Ms. Robinson made gestures toward her indicating that they wanted to fight. Ms. Williams responded by throwing a bottle in their direction.[5] Ms. Haynes saw Ms. Williams throw a bottle toward Defendant. Ms. Haynes ran toward Ms. Williams intending to attack her but heard gunshots before she got to Ms. Williams's location. Ms. Haynes then ran out of the club.

---

[4] Testimony at trial explained that the women had changed from high heels to tennis shoes in anticipation of a fight.

[5] There was conflicting testimony at trial as to whether she threw a bottle of hot sauce or a liquor bottle.

Ms. Williams made eye contact with Defendant prior to shots being fired. At trial, she testified she saw Defendant pull a gun from behind her back and begin shooting inside the club.[6] Mr. Clemmons was hit by a bullet in the chest. He died from his injuries.

Police investigation revealed two .380 semi-automatic bullet shell casings on the floor of the club. There was also a bullet hole on the wall near the DJ booth and a bullet hole on a bench near the DJ booth. Several bullet casings were recovered from outside the club. Defendant told police where to locate her gun in her car. It was tested by a firearms examiner, Patricia Ann Resig. Ms. Resig was unable to conclude whether Defendant's weapon was used to fire the bullets found inside the club and inside the victim. However, she was able to conclude that Defendant's weapon was used to fire shots outside the club.

Both Ms. Haynes and Defendant voluntarily spoke with police after the incident. Ms. Haynes admitted that she told police two different versions of the events. In her first statement, she told police that it was Ms. Robinson who fired the shot that killed the victim. In her second statement, she maintained that it was Defendant who was the shooter. Ms. Haynes described the events of the evening in detail at trial, changing her story about the events for the third time. She claimed that it was Ms. Williams who spit on the car and that Defendant confronted the group, shooting all of the bullets in her gun at the ground. Later in the club, Ms. Haynes was unable to see the shooter. Ms. Haynes claimed that she asked Ms. Robinson and Defendant who was responsible for the shooting and Ms. Robinson said she "didn't mean for it to happen like that."

During her interview, Defendant told investigators that she shot a gun at Ms. Davis outside the club. Once inside the club, Defendant stated that she did not have her gun but that Ms. Robinson had her gun hidden in her clothing. Defendant claimed that it was Ms. Williams who threw a bottle at her and Ms. Robinson who began shooting inside the club.

*Defendant's Proof*

Defendant called Dr. Jeffrey Neuschatz, a psychology professor at the University of Alabama to testify regarding eyewitness memory and investigation. Defendant sought to have Dr. Neuschatz, a specialist in the area of Makira psychology[7] who performed the majority of his research in eyewitness identification, certified as an expert. Defense counsel explained that Dr. Neuschatz would be offered

---

[6] In her initial statement, Ms. Williams claimed Defendant fired shots outside the club but did not fire shots inside the club.

[7] Makira psychology was never fully explained in the transcript.

[to give] testimony [that would help] to give substantial assistance to the jury [when analyzing the testimony of Ms. Williams and Ms. Davis]. What [the defense] want[s] to show is that basically what their memory of—you know, what they're thinking of or looking at the memory may not necessarily be correct. [Dr. Neuschatz] has already testified to the fact that what most people's idea of how memory works is not necessarily correct.

Defense counsel explained that the testimony would provide proof to the jury that the testimony of Ms. Williams and Ms. Davis was inaccurate. The trial court had a jury out hearing.

Dr. Neuschatz explained to the trial court that he had testified about eyewitness memory and identification in previous trials by "educat[ing] juries on the factors that affect eyewitness memory." By explaining that memory is "not written in stone" and that it changes when a person rehearses it, thinks about it, and collects additional information from outside sources. For example, people subconsciously utilize common knowledge to fill in gaps in their memory. Additionally, if they have certain expectations about an event or a place, they will often conform their memories to their expectations. Dr. Neuschatz testified that in high stress situations, people often focus on the weapon.

Analyzing the witness testimony in Defendant's trial, Dr. Neuschatz opined that Ms. Williams' testimony likely "fit in . . . pieces that she thought w[ould] tell a consistent story" because it was a swiftly happening event, there was a gun, she was under stress, and she had a preconceived notion of what would or could happen.

After hearing Dr. Neuschatz's proposed testimony, the trial court ruled that the testimony was not admissible as expert testimony. In making that determination, the trial court commented as follows:

> I think as to what the individual and collective memories are and how they are to be reconciled is first . . . that—which is in the function of the jury—they are instructed that they are to use their collective memories. And every time they ask a question we send them back a letter that says, "You need to support (sic) your collective memories."
>
> Secondly, it would open a door to, um, challenging the jury system in a certain respect.
>
> Thirdly, . . . it may assist the jurors in understanding how to look at everybody's memory. But it may also be misleading in the sense that they are to look at the witnesses and their testimony, and not just to evaluate

memory but also credibility, reliability, and a number of things in order . . . to reach these decisions.

So with great respect to this very, very excellent psychologist[,]. . . I think I'm not going to let him testify as to this.

Defense counsel also called Arterius North to testify on Defendant's behalf. Mr. North, who was in State custody with several pending criminal charges at the time of trial, was sworn in by the trial court and admonished that he had the right to remain silent and that if he chose to testify his answers could be used against him in further proceedings. Mr. North acknowledged the trial court's statements and expressed his desire to testify on Defendant's behalf.

Mr. North expressed his lack of interest in being part of Defendant's trial but acknowledged that he was inside The Grand on the night of the shooting. He testified that he was getting into an altercation with Mr. Hardin and that Defendant stepped in between the men, attempting to separate them and prevent a fight. Mr. North claimed that someone threw a bottle in his direction and that the shooting occurred shortly thereafter. Mr. North testified that Defendant was not in possession of a gun.

On cross-examination, counsel for the State asked Mr. North if he was a member of the "Tree Top Pirus Gang." Mr. North refused to answer that question because he was afraid it would incriminate him. The trial court informed Mr. North that he could not "pick and choose" which questions he wished to answer and that if he chose to invoke his right to remain silent, all of his testimony would be stricken from the record. Mr. North refused to answer the question. As a result, the trial court struck his testimony, informing the jury that they were not to consider it for any purpose.

Defendant took the stand. She testified that she did not shoot a gun inside The Grand, pointing the finger at her fellow group member, Ms. Robinson. She also explained that she, Ms. Robinson, and Ms. Haynes got into a fight in January against Ms. Williams, Ms. Davis, and some other girls. She explained the fight was not related to "gangs" but was actually just "girl drama."

Defendant recounted the night of the incident. Defendant drove her car to The Grand with Ms. Robinson and Ms. Haynes inside. Ms. Robinson claimed that Ms. Williams spit on the car as they drove by the club. Defendant felt that Ms. Williams' actions were "disrespectful," so she stopped the car. The three women inside the car got out and approached Ms. Williams and Ms. Davis. Defendant and Ms. Haynes walked up to Ms. Williams. Defendant recalled asking Ms. Williams twice to explain why she spit on the car. Ms. Williams just laughed. Defendant admitted that she took out her pistol, cocked it, and held it at her side pointed toward the ground. She discharged the pistol

into the ground five times in an attempt to scare Ms. Williams. Defendant testified that Ms. Williams responded by running away. Defendant was unable to see what was happening between Ms. Robinson and Ms. Davis at that time but later saw Ms. Robinson banging her pistol and saying it was jammed. After this incident, Defendant returned her pistol to the car and placed it under her seat. Ms. Robinson kept her pistol with her.

Defendant testified that after this altercation outside The Grand, the three women left the area and met up with a few male friends. Once the group returned to The Grand, Defendant claims that she tried to break up an argument between Mr. North and another man. Defendant stated that she stepped in between the two men when someone threw a bottle. The bottle broke, and someone started shooting. Defendant ran out of the club to a car. She left with Ms. Robinson, Ms. Haynes, and their male friends. She was taken back to her car where she asked Ms. Robinson who was shooting. Ms. Robinson informed her that she "didn't mean to do it."

At the conclusion of the trial, the jury found Defendant guilty of the lesser included offense of reckless endangerment in Counts One and Two; not guilty in Counts Three and Four; guilty of the lesser included offense of second degree murder in Counts Five and Six; guilty of the lesser included offense of attempted second degree murder in Count Seven; and guilty of possession of a firearm during a dangerous felony in Count Eight. After a sentencing hearing, the trial court sentenced Defendant to an effective sentence of 25 years. Specifically, the trial court merged the two second degree murder convictions and sentenced Defendant to twenty-five years for the merged conviction; twelve years on the attempted second degree murder conviction; six years on the conviction for employing a firearm during a dangerous felony; and eleven months and twenty-nine days for each conviction for reckless endangerment. The trial court ordered the conviction for employing a firearm during a dangerous felony to be served consecutively to the attempted second degree murder conviction. All other convictions were ordered to be served concurrently.

Defendant filed a timely notice of appeal. On appeal, Defendant challenges several evidentiary rulings, the sufficiency of the evidence, and her sentence.

*Analysis*

*I. Evidentiary Issues*

Initially, Defendant complains about several evidentiary rulings made by the trial court during trial. Specifically, she argues that the trial court erred by excluding expert testimony, erred by allowing references to gang activity and nicknames, erred by allowing the State to use Facebook pictures at trial, and erred by striking the testimony of Mr. North. We will address each issue separately.

- 8 -

*A. Expert Testimony*

Defendant complains that the trial court's decision to exclude the testimony of Dr. Neuschatz was error when the witness's testimony met the relevant criteria for reliable expert testimony. Specifically, Defendant sought to introduce the testimony of Dr. Neuschatz in the area of memory and eyewitness identification in an effort to show that the memory of witnesses is often compromised in high stress situations. Defense counsel was attempting to attack the credibility of the eyewitnesses through the testimony of the expert. The State insists that the trial court properly excluded the testimony.

Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court. *See McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263-64 (Tenn. 1997); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). On appellate review, the trial court's ruling shall not be overturned absent a finding that the trial court abused its discretion in admitting or excluding the expert testimony. *Ballard*, 855 S.W.2d at 562. "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

Rule 702 of the Tennessee Rules of Evidence addresses the admissibility of opinion testimony of expert witnesses. It states in pertinent part:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Additionally, Tennessee Rule of Evidence 703 requires the expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course.'" *State v. Murphy*, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting *State v. Bolin*, 922 S.W.2d 870, 874 (Tenn. 1996)). Additionally, an expert witness's testimony must be relevant to the issues at trial. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

In *McDaniel*, the Court adopted a non-exclusive list of factors that a trial court should consider when determining the reliability of expert testimony. 955 S.W.2d at 265. Those include: (1) whether the scientific evidence has been tested and the accompanying methodology with which it was tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether the potential rate of error is known; (4) whether the evidence is generally accepted in the scientific community; and (5) whether the expert conducted the research in the field independent of litigation. *Id*. The application of the factors, a "gatekeeping function" of the trial court, operates to ensure introduction of testimony that "'characterizes the practice of an expert in the relevant field.'" *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1998)). However, the *McDaniel* factors are only relevant to the extent they are reasonable measures of testing the reliability of the proposed expert testimony. *Id.* at 277.

In *State v. Copeland*, the Tennessee Supreme Court expanded on the ruling in *McDaniel*. 226 S.W.3d 287 (Tenn. 2007), *overruling State v. Coley*, 32 S.W.3d 831 (Tenn. 2000). In *Copeland*, the court determined that a defendant could introduce testimony from an eyewitness identification expert even if this testimony is not specific to the witness whose testimony is in question. 226 S.W.3d at 298-304.

Defendant herein argues that the trial court failed to:

> properly engage in its "gatekeeping function" when it refused to allow Dr. Jeffrey Neuschatz to testify as a defense witness on the unreliability of eyewitness testimony, which relied on scientifically document[ed] research that factors [such] as stress, distractions, time of exposure to the information to be remembered, memory conformity, and misleading post-event information can affect the reliability of memories of events; that people who are engaged in social media . . . are likely to have fluid and changing recollections of events; and that people who are put in stressful situations are likely to have impaired memories and impaired ability to make eyewitness identifications, especially, as in this case, if weapons are involved. . . .

Prior to the proposed expert testimony, the trial court held a hearing. During the hearing, Dr. Neuschatz testified about eyewitness memory and identification and, more specifically how memory works. Dr. Neuschatz went into detail to explain that memory does not work like a movie playing in your mind—rather people use common knowledge to fill gaps in their memory and often conform their memory to preconceived expectations with regard to events. Further, Dr. Neuschatz testified as to the impact of high stress situations on memory. As a result, Dr. Neuschatz opined that Ms. Williams' memory would likely cause her to "fit in . . . pieces that she thought w[ould] tell a

consistent story" when examining the stressfulness of the situation, its short time span, and her own preconceived notions. In other words, Defendant sought to show that the eyewitness accounts provided at trial were inaccurate. In excluding the testimony, the trial court commented that it found the testimony would serve to undermine the jury's task of evaluating the credibility of the witnesses.

In this case, the intended victim, Ms. Williams, had a long history with Defendant—there was no issue that she was able to identify Defendant as being present at the club that night. Additionally, at least two other witnesses presented at trial testified that they saw Defendant fire a gun both inside and outside the club. The only testimony that Defendant did not fire the gun inside the club was from the Defendant. Further, there is no question whether Defendant was at the club that night or firing shots outside the club because she admitted both. Regardless of the expert testimony, Defendant could have, by her own admission, been found guilty of criminal responsibility. Thus, admission of the expert testimony would have been superfluous and would have served only to confuse or mislead the jury. Tenn. R. Evid. 401. Lastly, the trial court gave a specific jury instruction on how to assess and weigh the eyewitness testimony. This instruction included many of things Defendant sought to introduce by way of Dr. Neuschatz's testimony, effectively providing assistance to the jury on how to assess eyewitness testimony. We cannot conclude that the trial court abused its discretion in excluding the testimony of Dr. Neuschatz even its rationale that it would invade the province of the jury is misplaced. Defendant is not entitled to relief on this issue.

### B. Introduction of Gang Affiliation, Nicknames, and Facebook Posts

Next, Defendant complains that the trial court improperly admitted evidence of her gang affiliation and nickname along with photographs from Facebook in violation of Tennessee Rule of Evidence 404(b). The State disagrees, arguing that the evidence "completed the story and established the motives and intent of the parties." Additionally, the State insists that the probative value of the evidence outweighed any prejudicial effect.

Relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Where the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice, it may be inadmissible. Tenn. R. Evid. 403. Moreover, "[e]vidence of other crimes, wrongs, or acts" is inadmissible character evidence if offered to show a defendant's "action in conformity with [a] character trait." Tenn. R. Evid. 404(b); *State v. Parton*, 694 S.W.2d 299, 654 (Tenn. 1997). "The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime." *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003) (citing *State v. Adkisson*, 899 S.W.2d 626

- 11 -

(Tenn. Crim. App. 1994)). However, other act evidence may be admitted for other purposes only after the following requirements have been met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

"Other purposes" has been defined to include: (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation. *Parton*, 694 S.W.2d at 302; *Bunch v. State*, 605 S.W.2d 227, 229 (Tenn. 1980); *State v. Jones*, 15 S.W.3d 880, 894 (Tenn. Crim. App. 1999).

Tennessee's Rule 404(b) establishes more stringent safeguards for ensuring proper introduction of this kind of evidence than its federal counterpart. *State v. James*, 81 S.W.3d 751, 759 (Tenn. 2002) (citing *State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996)); *compare* Tenn. R. Evid. 404(b) *with* Fed. R. Evid. 404(b). Our rule has been aptly described as one of "exclusion" rather than inclusion. *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014) (citing *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)). Consequently, "[t]rial courts have been encouraged to take a restrictive approach of Rule 404(b) because 'other act' evidence carries a significant potential for unfairly influencing a jury." *Id.* (internal quotation and citation omitted).

A trial court's decision to admit or exclude evidence under Rule 404(b) is reviewed by an abuse of discretion standard, if the trial court has substantially complied with the procedure mandated by the Rule. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in injustice to the complaining party." *Jones*, 450 S.W.3d at 892 (internal quotation and citation omitted). Appellate court review of the issue of admissibility is confined to the evidence presented to the trial court during the jury-out hearing. *DuBose*, 953 S.W.2d at 653.

Before the trial began, the trial court held a hearing on the admissibility of certain other act evidence for which the State gave advance notice of its intent to introduce during its case-in-chief. From the transcript of the hearing, it appears that the following different pieces of evidence were considered by the court and the parties to be potential Rule 404(b) evidence: (1) Defendant's nickname, "Boss Lady"; (2) Defendant's membership in the Westside 111 Neighborhood Crips with both Ms. Robinson and Ms. Haynes; and (3) photographs from Defendant's Facebook page wherein she is depicted with the members of the gang. The State argued that these pieces of evidence were admissible to establish motive, intent, completion of the story, identification of the defendant, and relationship of the parties through involvement in the gang. The proposed evidence "explains why this victim felt the way she felt when she saw this group of girls driving by, why she did what she did" and is relevant under the theory of criminal responsibility.

During the pretrial hearing, Ms. Haynes testified that she, Defendant, and Ms. Robinson had known each other since they were seven or eight, were all members of the Westside 111 Neighborhood Crips gang and became members by fighting each other. She also testified that they carried guns and protected each other in fights.

The trial court issued its pretrial evidentiary ruling, determining that the nicknames were admissible because they were just nicknames. However, the trial court ruled that neither party could refer to the group as a "gang" but rather should refer to them as a group, friends, association, etc. Additionally, the trial court told the parties not to use the word "crips" because it was potentially prejudicial.

Once the trial began, another 404(b) hearing was held during the testimony of Ms. Davis. During this hearing, the trial court more fully explained its ruling as follows:

> Ms. Davis testified that there was ganging on somebody, then there was membership in a gang, and that these three ladies at least were friends and members of a gang. And that not only were they out looking for boys, they were looking for fighting opponents and/or partners. And . . . that is why Ms. Davis was concerned when she saw their car, when she saw them looking at her. She alerted her own friends and cousin, Ms. Williams, that they were there and that there might be a fight. They discussed a fight.

> That's common behavior, common motive. It goes to what was in Ms. Davis'[s] mind. It goes to . . . the intent of the parties. And I have a real problem with using the term[] . . . gang because for us who live in a . . . . slightly different world than these ladies have lived, a gang implies violent, color wars, and all those other things that I've seen right here in the

- 13 -

courtroom. However, in this circumstance . . . to explain to the jury how they got into their problems, that they were a group of people who were engaging in fights, both on Facebook and in reality, who . . . were making friends and making enemies, I think that it would be appropriate for the Attorney General to be able . . . to explain what that meant in terms of them if she wishes to do so, not to go into what a crip is, not to define a gang. You've already said you will not do that. I will allow you to talk about the . . . common schemes, motives, purposes of . . . these ladies through testimony. Ms. Davis has testified to a certain extent about that briefly.

[A]lthough this is a group of girls who have known each other many years, that does not mean that they did not have a certain motive in mind when they walked up, both with guns, toward . . . Ms. Davis. And I'm going to allow the Attorney General to go into it in the manner in which she's sort of defined.

To use it however as a gang in a manner that we would define crips and bloods and a variety of other people would be inappropriate, General.

This Court previously has held that evidence of gang affiliation is character evidence subject to Rule 404(b). *See, e.g.*, *State v. Robert Edward Fritts*, No. E2012-02233-CCA-R3-CD, 2014 WL 545474, at *15 (Tenn. Crim. App. Feb. 20, 2014), *perm. app. denied* (Tenn. Sept. 19, 2014); *State v. Ronald Eugene Brewer, Jr.*, No. E2010-01147-CCA-R3-CD, 2011 WL 2732566, at *16 (Tenn. Crim. App. Jul. 14, 2011), *perm. app. denied* (Tenn. Sept. 21, 2011). As such, gang-related evidence "may be relevant and admissible to prove issues such as identity, motive, opportunity, or absence of mistake or accident." *See* Tenn. R. Evid. 404(b). Here, the Defendant's membership in the Westside 111 Neighborhood Crips was relevant and admissible because it assisted the jury in identifying her as criminally responsible and helped to establish a motive for the offense. *See State v. Orlando Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3-4 (Tenn. Crim. App. June 27, 2001). We cannot conclude that the probative value of the gang-related evidence was outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 404(b)(4).

In this case, the trial court substantially complied with the requirements of Tennessee Rule of Evidence 404(b) and properly found that the evidence was admissible as to Defendant's motive for participating in the altercation outside The Grand and the events the led to the shooting death of the victim inside The Grand. Furthermore, the evidence is relative to Defendant's intent. Specifically, with regard to the evidence of Defendant's affiliation with the group, the trial court determined that the evidence was admissible to show motive, stating "this group of girls who have known each other many

- 14 -

years, that does not mean that they did not have a certain motive in mind when they walked up, both with guns, toward [Ms. Williams and Ms. Davis outside The Grand]."

Defendant tries to minimize the association by insisting that the shots fired inside the club happened as a result of Ms. Williams' throwing a bottle at Defendant inside the club, not from the activities of the group. It is quite clear from the record that the women were in a group, carried guns, and protected each other during fights. Whether they were actually referred to as a gang or as a group, there were plenty of facts to support the group's existence and what it meant to the individual members of the group. In fact, there was evidence that there was a previous fight and/or feud between Ms. Williams and Ms. Davis and Defendant and her girlfriends.

We conclude that the trial court did not abuse its discretion when it allowed the name of the group into evidence. The trial court attempted to minimize any negative connotations by telling the parties to refer to them as a group rather than a gang. The State's theory at trial was that the group affiliation was the reason that Defendant was involved in backing up the actions allegedly taken by all three of the three women outside The Grand and by Ms. Robinson inside The Grand. Additionally, on cross-examination of Ms. Davis, counsel for Defendant actually referred to the organization as a "gang" despite his earlier objection to this term. Moreover, we agree with the trial court's findings that the probative value of the evidence outweighed the danger of unfair prejudice. Defendant is not entitled to relief on this issue.

With regard to the Defendant's nickname, "Boss Lady," Defendant argues that the trial court erred because there was no evidence that Defendant was the "mastermind of some criminal outfit." According to Defendant, the State failed to show that the nickname was relevant, much less that it overcame the inherent prejudice that it carried. The State argues that it sought to use the nickname to prove that Defendant was a leader in the commission of the offense under a theory of criminal responsibility. The State argues that the trial court correctly introduced the nicknames into evidence, pointing out that the trial court determined the nicknames were admissible because they were just nicknames and did not indicate prior bad acts. We agree. Again, the trial court followed the proper procedure under Rule 404(b) prior to admitting the nicknames into evidence. The nicknames of Boss Lady, First Lady, and Diamond Lady, in and of themselves, are not prejudicial. Moreover, there was no testimony linking the nicknames to any particular gang activity or gang-related status.

Lastly, with regard to the introduction of the photographs and information from Defendant's Facebook page, we determine that the trial court did not abuse its discretion. Ms. Davis testified that she was in a fight earlier in the year that got uploaded to Facebook, and Defendant and Ms. Robinson made derogatory comments about her and the fight on Facebook. Ms. Davis relied in part on the history between the parties to

assess the situation outside The Grand and came to the belief that a fight was impending. Defendant had multiple pictures on Facebook containing the three female members of the Westside 111 Neighborhood Crips in various poses. The photographs of Defendant and her fellow gang members showed that they were a tightly knit group. Additionally, the testimony about Facebook and the statements made back and forth between Ms. Davis and Defendant helped to explain why either Ms. Davis or Ms. Williams may have spit on Defendant's car prior to Defendant shooting her gun. This evidence showed the history between the intended victim and Defendant. Defendant is not entitled to relief on this issue.

## II. Testimony of Mr. North

Defendant argues on appeal that the trial court improperly struck Mr. North's testimony from the record. As described by defense counsel, Mr. North testified as a "reluctant" witness for Defendant. At trial, prior to Mr. North's testimony, the trial court acknowledged that Mr. North was in custody and facing charges. The trial court informed Mr. North that any testimony he gave at Defendant's trial could be used against him in the future. After questioning Mr. North on his understanding of how his testimony could affect his pending charges, Mr. North agreed to testify.

Mr. North stated that Defendant was at The Grand when she stepped between him and another gentleman, actually trying to break up a fight between them. Defendant was standing between Mr. North and "D Hard" when shots were fired. Mr. North testified emphatically that Defendant did not have a gun that evening.

On cross-examination, counsel for the State asked Mr. North about his membership in a local gang, the "Tree Top Pirus." Mr. North refused to answer the question on the basis that divulging his membership in a gang "might incriminate [him] in the future." The trial court instructed Mr. North to answer or cautioned that his testimony would be struck from the record. He refused to answer and the trial court struck the testimony. Counsel for Defendant objected. Counsel for the State argued that the question was intended to show bias. The State sought to introduce the fact that he was a member of a gang that got along with the Westside 111 Neighborhood Crips and would, therefore, have reason to protect Defendant by providing testimony favorable to the defense at trial. The prosecutor insisted that counsel for Defendant was aware that the State intended to question Mr. North on his gang affiliation.

Defendant argues on appeal that the trial court should have directed Mr. North to answer or be held in contempt, adjourned the proof until Mr. North could confer with counsel, or prohibited the State from inquiring into gang affiliation on the grounds of unfair prejudice. Defendant argues that striking the testimony "not only precluded the jury from considering exculpatory testimony from a third party, but [also] gave the State

yet another chance to smear the Defendant with the supposed association of gang members." The State contends that Defendant waived the issue for failing to present these options to the trial court, instead succumbing to the solution presented by the trial court of striking the testimony in its entirety. In the alternative, the State argues that the trial court properly struck the testimony.

Under the Sixth Amendment to the United States Constitution, which is applicable to the states via the Fourteenth Amendment, an accused has the right to compulsory process in order to obtain witnesses favorable for the defense. *State v. Hester*, 324 S.W.3d 1, 93-94 (Tenn. 2010) (appendix) (citing *Faretta v. California*, 422 U.S. 806, 816 (1975)). Similarly, the Tennessee Constitution affords a defendant facing criminal prosecution the right "to have compulsory process for obtaining witnesses in his favor." Tenn. Const. art. I, § 9. Regardless, a criminal defendant's right to compulsory process is not without limits; instead, "'the constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible.'" *State v. Smith*, 639 S.W.2d 677, 680 (Tenn. Crim. App. 1982) (quoting *Bacon v. State*, 385 S.W.2d 107, 109 (Tenn. 1964)).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." *See also* Tenn. R. Evid. 501 ("Except as otherwise provided by constitution, . . . no person has a privilege to . . . refuse to disclose any matter."). This Amendment and corresponding rule permit a witness to refuse to disclose any matter upon assertion of the right against self-incrimination.

Our supreme court has cautioned, however, that "[t]he calling of a witness who will refuse to testify does not fill the purpose of compulsory process, which is to produce testimony for the defendant." *State v. Dicks*, 615 S.W.2d 126, 129 (Tenn. 1981). In fact, the Sixth Amendment right to confrontation must yield when a witness properly asserts his own Fifth Amendment right against self-incrimination. In other words, the right to impeach a witness through vigorous cross-examination is subordinate to a properly presented Fifth Amendment privilege against self-incrimination. *See Alford v. United States*, 282 U.S. 687 (1931). The Tennessee Supreme Court has further stated that

> [i]f it appears that a witness intends to claim the privilege as to essentially all questions, the court may, in its discretion, refuse to allow him to take the stand. Neither side has a right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him.

*Dicks*, 615 S.W.2d at 129 (quoting *United States v. Johnson*, 488 F.2d 1206, 1211 (1st Cir. 1973)). Additionally,

[a] trial witness other than the accused in a criminal prosecution may not claim a blanket Fifth Amendment immunity from giving relevant testimony simply because certain questions which may be asked on cross-examination might elicit incriminating answers. The witness should be required to answer those questions seeking to elicit relevant non-incriminating information in the witness'[s] possession. If the witness is asked for incriminating information on cross-examination he may claim the Fifth Amendment privilege at that time.

*State v. Dooley*, 29 S.W.3d 542, 551 (Tenn. Crim. App. 2000).

The trial court has the discretionary authority to determine "whether a witness has properly invoked his fifth amendment right against self-incrimination." *State v. Zirkle*, 910 S.W.2d 874, 890 (Tenn. Crim. App. 1995). This Court will reverse the trial court's decision for an abuse of discretion. *Id.*

Though not cited by either party, we find the analysis in *State v. Horace Charles Corum*, 1993 WL 467932 (Tenn. Crim. App. Nov. 15, 1993), to be instructive. In *Horace Charles Corum*, two defendants were on trial for aggravated burglary and theft of property valued over $1000. *Id.* at *1. During trial, a codefendant, Jeff Hughett, testified for the State, inculpating the defendant in the crimes by reading two statements that he had previously provided to police. On cross-examination, Hughett claimed that the statements were untrue and that someone named "Jubal" had actually committed the crimes. *Id.* at *2. Out of the hearing of the jury, the trial court advised Hughett he was exposing himself to a charge of perjury and that he could utilize the Fifth Amendment if he so wished. Hughett conferred with his attorney and then invoked his Fifth Amendment right on cross-examination. *Id.* at *3. The defendant sought a mistrial. The trial court denied the mistrial. On appeal, this Court noted the importance of Hughett's testimony as the "crucial link to the State's case against the defendants" as it was the "only evidence that placed [the defendants] in Grainger County on the date of the burglary and theft." *Id.* at *3. This Court recognized that ordinarily, Fifth Amendment issues arise when a witness completely refuses to testify. In those cases, "the general rule [that the right of another against self-incrimination is stronger than the right to confront witnesses] is easy to apply." The situation presented in *Horace Charles Corum* was difficult because the witness had provided damaging testimony on direct and refused to testify on cross. The court noted:

In a situation like the present case, the usual remedy is to strike the testimony of the witness, followed by an appropriate instruction to the jury, or in some cases, a mistrial may be required. *See United States v. Lyons*, 703 F.2d 815 (5th Cir. 1983).

- 18 -

In a case where the witness by invoking his privilege against self-incrimination precludes inquiry into the details of his direct testimony, a substantial danger of prejudice may arise because the defense is deprived of the right to test the truth of the witness'[s] direct testimony and, therefore that witness'[s] testimony should be stricken in whole or in part. *Nunez v. United States*, [668 F.2d 1116, 1121 (10th Cir. 1981)].

In *United States v. Lyons*, . . . the court said:

When a prosecution witness invokes the [F]ifth [A]mendment after testifying on direct examination, the privilege against self-incrimination conflicts with the defendant's [S]ixth [A]mendment confrontation rights. The defendant is deprived of his right to inquire into the witness'[s] credibility through cross-examination. If this impediment to cross-examination creates a "substantial danger of prejudice by depriving [the defendant] of the ability to test the truth of the witness's direct testimony," relief is warranted. (Citations omitted).

Ordinarily, the appropriate relief in such a case is for the trial judge to strike the direct testimony of the witness. (Citations omitted) If the direct testimony is especially prejudicial, however, as it may be when the witness bears a special relationship to the defendant, we have held this remedy inadequate. On the premise that the jury could not follow the instruction to disregard the witness'[s] testimony, we have then required a mistrial. (Citations omitted).

703 F.2d at 819.

In the present case, the trial judge should have solved the problem that confronted him by either striking Hughett's testimony, followed by an appropriate instruction to the jury to disregard the testimony, or by granting the defendants' motion for a mistrial, if he deemed that the jury could not follow his instruction to disregard the testimony. Of course, as previously indicated, neither remedy was applied in this case.

*Horace Charles Corum*, 1993 WL 467932, at *4-5. The court reviewed what transpired at trial and determined, "we conclude that Hughett's invocation of his privilege against self-incrimination, even if properly invoked, unquestionably served to prevent the

defendants from cross-examining him to test the truth of his direct testimony. Hughett's testimony should have been stricken." As a result, the court reversed and remanded for a new trial.

In this case, we have essentially the opposite conundrum: a defense witness who provided favorable, exculpatory evidence for the defense on direct examination and refused to testify on cross-examination. In *Horace Charles Corum*, on the other hand, it was a witness for the State who provided damaging testimony. In *Horace Charles Corum*, the constitutional right at stake was the right to confront witnesses. In the case herein, the Defendant's rights to compulsory process and to present a defense are at stake. We find the same analysis applies but reach a different result.

Here, there is no question that the testimony of Mr. North was essential to Defendant's case. In fact, as pointed out by Defendant on appeal, Mr. North provided the only testimony that would corroborate Defendant's own testimony that she did not have her gun inside The Grand. It is also fairly clear from the record that Mr. North was facing pending prosecution for which any testimony he gave at Defendant's trial could be used against him in the future. The State, of course, sought to cross-examine Mr. North to show bias. *See* Tenn. R. Evid. 616 ("A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness."). Rule 611(b) of the Tennessee Rules of Evidence provides that a witness "may be cross-examined on any matter relevant to any issue in the case, including credibility." Once Mr. North refused to answer a question regarding his gang affiliation on cross-examination, the trial court was faced with a difficult decision of balancing Defendant's right to present a defense with Mr. North's right of protecting himself from future prosecution—most definitely conflicting constitutional rights.

As stated above, we have previously held that "where there is a conflict between the basic right of a defendant to compulsory process and the witness's right against self-incrimination, . . . the right against self-incrimination is the stronger and paramount right." *State v. Dicks*, 615 S.W.2d 126, 129 (Tenn. 1981). However, in our view, the balancing of interests in this case—pitting an attempt to show bias of a witness against Defendant's right to compulsory process and to present a defense, weighs heavily in Defendant's favor. If we were to hold otherwise, Defendant would be prevented from mounting a defense. In other words, the trial court erred by striking the testimony of Mr. North. Because the trial court violated Defendant's constitutional right to present a defense, Defendant is entitled to a new trial unless we are convinced beyond a reasonable doubt, and on the basis of the entire record, that this error did not contribute to the jury's verdict. *See State v.Rice*, 184 S.W.3d 646, 672-73 (Tenn. 2006); *see also Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) ("The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.");

*Chapman v. California*, 386 U.S. 18, 24 (1967) (holding that, "before a federal constitutional error can be held harmless, the [reviewing] court must be able to declare a belief that it was harmless beyond a reasonable doubt"); *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) ("The test used to determine whether a non-structural constitutional error is harmless is 'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'") (quoting *State v. Allen*, 69 S.W.3d 181, 190 (Tenn. 2002)) (internal quotation marks omitted); *Momon v. State*, 18 S.W.3d 152, 168 (Tenn. 1999) (recognizing that "the goal of [constitutional] harmless error analysis is to identify the actual basis on which the jury rested its verdict") (citing *Sullivan*, 508 U.S. at 279). The factors to consider in determining whether the erroneous exclusion of defense proof was harmless beyond a reasonable doubt include (1) the importance of the proof to the defense's case; (2) the extent to which the excluded proof was cumulative; (3) the extent of other evidence corroborating or contradicting the excluded proof; and (4) the overall strength of the State's case. *See Momon*, 18 S.W.3d at 168 (considering harmlessness of trial court's erroneous denial of defendant's right to testify). In this case, the State relied on the theory of criminal responsibility to secure the convictions. Mr. North's testimony, even if included, did little to exonerate Defendant from the crimes. We determine that the error is harmless and Defendant is not entitled to relief on this basis.

## *III. Sufficiency*

Next, Defendant challenges the sufficiency of the evidence for her convictions for second degree murder, attempted second degree murder,[8] and employing a firearm during a dangerous felony.[9] Specifically, Defendant argues that there was insufficient proof that she was a "'gang' leader who was directing the acts of subordinates in furtherance of some sort of gang goal" and that there was insufficient proof that Defendant employed a firearm inside The Grand or even possessed a gun inside the establishment. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of

---

[8] Defendant incorrectly lists her conviction in Count Seven as a conviction for facilitation of first degree murder.

[9] Defendant does not appear to challenge her convictions for reckless endangerment.

every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

The jury convicted Defendant of second degree murder and attempted second degree murder as well as employing a firearm during the commission of a dangerous felony.

### A. Second Degree Murder

"A knowing killing of another" is second degree murder. T.C.A. § 39-13-210(a)(1). A person acts "knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-13-302(b). At trial, the State utilized the theory of criminal responsibility. *See State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) (defining criminal responsibility as a "theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person"). Under Tennessee Code Annotated section 39-11-402, a defendant is criminally responsible for an offense committed by the conduct of another person if, "with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the [defendant] solicits, directs, aids, or attempts to aid another person to commit the offense."

Viewing the evidence in a light most favorable to the State, there was sufficient proof to support the conviction for second degree murder. Defendant admitted that she was outside The Grand with a loaded gun. Defendant also admitted that she had given Ms. Robinson bullets for her gun. Ms. Williams testified that she was outside The Grand talking with her friends when Defendant and her group approached her and fired several shots toward her. Defendant admitted during her testimony that she fired her gun outside the club in the direction of Ms. Williams. Sometime later, both women were inside the club. Ms. Williams threw a bottle in the direction of Defendant. Ms. Williams testified

that Defendant pulled out a gun and shot in her direction, striking Mr. Clemmons in the chest. Mr. Clemmons died as a result of a gunshot wound.

Defendant argues on appeal that her testimony proved that she did not have her gun inside the club and, therefore, could not be guilty of second degree murder. Defendant also argues that Ms. Robinson's admission of accidentally killing Mr. Clemmons and Ms. Haynes's testimony support her version of the story and her argument that the evidence is insufficient. Even if the jury were to accept Defendant's testimony as true, there was sufficient proof to find guilt under a theory of criminal responsibility. The proof indicates that Defendant went to the club looking for a fight, gave Ms. Robinson bullets for her gun, and stood near Ms. Robinson while she shot Mr. Clemmons— sufficient proof for the jury to find Defendant guilty of second degree murder.

### B. Attempted Second Degree Murder

As stated above, a "knowing killing of another" is second degree murder. T.C.A. § 39-13-210(a)(1). A person acts "knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-13-302(b). Criminal attempt of an offense may be proven when an individual:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a).

Viewing the evidence in a light most favorable to the State, Defendant took a substantial step toward killing Ms. Williams inside The Grand. Again, Defendant admitted that she was outside The Grand with a loaded gun and that she had given Ms. Robinson bullets for her gun. After a confrontation outside, both Ms. Williams and Defendant were inside the club. Ms. Williams threw a bottle in the direction of Defendant.

Based on this proof, the jury could infer that Defendant took a "substantial step" toward the commission of the offense. "Whether the appellant 'knowingly' attempted to kill his victim is a question of fact for the jury." *State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury heard the proof, and clearly chose to accept the State's theory. The evidence was sufficient to support the conviction for attempted second degree murder.

### C. *Employing a Firearm During the Commission of a Dangerous Felony*

Lastly, Defendant challenges her conviction for employing a firearm during the commission of a dangerous felony. "It is an offense to employ a firearm during the . . . [a]ttempt to commit a dangerous felony." T.C.A. § 39-17-1324(b)(2). Attempted second degree murder is a "dangerous felony." T.C.A. § 39-17-1324(i)(1)(B). A "firearm" is "any weapon designed, made or adapted to expel a projectile by the action of an explosive or any device readily convertible to that use." T.C.A. § 39-11-106(a)(11).

The evidence presented at trial established that Defendant and Ms. Robinson had loaded guns outside the club. Defendant testified that she left her gun in her car when she returned to the club and went inside but that Ms. Robinson hid her gun "in her pants" how she "always" does. Defendant's argument on this issue is scant, but we surmise that it is premised on the contention that the evidence is insufficient to establish that she intended to knowingly kill the victim. Thus, the conviction for employing a firearm during an attempt to commit a dangerous felony is improper. *See, e.g.*, *State v. Narrell Christopher Pierce*, No. M2014-00120-CCA-R3-CD, 2015 WL 2102003, at *15-17 (Tenn. Crim. App. May 5, 2015), *perm. app. denied* (Tenn. June 16, 2015). We have already determined that the evidence is sufficient to sustain Defendant's conviction for attempted second degree murder and second degree murder. Accordingly, Defendant's argument is without merit.

### IV. *Sentencing*

Lastly, Defendant argues that her sentence is excessive. Specifically, she contends that a sentence of twenty-five years is "not presumptively reasonable, because it was improper to sentence the Defendant based on so-called 'gang' affiliation, and for the criminal responsibility for the acts of Pristina [sic] Robinson, where there was insufficient proof. . . [that she committed the offenses]." The State disagrees.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d

682, 707 (Tenn. 2012). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. T.C.A. § 40-35-401, Sent'g Comm'n Cmts.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

Tennessee Code Annotated section 40-35-114 contains a non-exclusive list of enhancement factors. The weighing of both enhancement and mitigating factors is left to the trial court's sound discretion. We note that even a trial court's misapplication of an enhancement or mitigating factor in imposing a sentence will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. In addition, the trial court must also consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102,-103,-210; *see also Bise*, 380 S.W.3d at 697-98.

At the conclusion of the sentencing hearing, the trial court determined that Defendant had a prior history of criminal conduct and behavior by affiliating herself with a gang. The trial court noted Defendant's repeated criminal behavior of fighting people and carrying a gun. The trial court found that the crimes herein involved multiple potential victims because Defendant chose to fire her gun in a crowded area. Similarly, the trial court determined Defendant had no hesitation about committing a crime when the risk to human life was high. In her benefit, the trial court notes that Defendant was relatively young and managed to cooperate fully with the investigators after the crime occurred, even turning in her weapon. After balancing the enhancement and mitigating factors and considering the statutory sentencing factors, the trial court sentenced Defendant to a within-range sentence of twenty-five years for second degree murder. The trial court did not abuse its discretion. Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE